IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TRIANGLE GRADING & PAVING,      )
INC.,                           )
                                )
            Plaintiff,          )
                                )
    v.                          )        1:19CV486
                                )
RHINO SERVICES, LLC, and LONNIE )
STEVEN BLACKSTONE,              )
                                )
            Defendants.         )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before the court is the Motion to Dismiss under Rule
12(b)(2) for lack of personal jurisdiction or, alternatively, to
transfer this action pursuant to 28 U.S.C. § 1404(a) to the U.S.
District Court for the Northern District of Georgia, (Doc. 8),
filed by Defendants Rhino Services, LLC ("Rhino") and Lonnie
Steven Blackstone ("Blackstone"). Rhino, through its sole member
and manager, Blackstone, approached Plaintiff Triangle Grading &
Paving, Inc.'s ("Triangle") agent in Georgia to enter into an
ongoing, collaborative relationship. Triangle was the general
contractor for a road construction project in Georgia, and Rhino
was a Georgia-based subcontractor for Triangle. For the reasons
stated herein, the court finds it has personal jurisdiction and

that Defendants have not met their burden in showing that transfer is appropriate.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' affidavits, complaint, and documents attached to pleadings and motions. See Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016). Factual disputes are noted and addressed where they exist. Neither party has requested discovery or an evidentiary hearing for purposes of the personal jurisdiction or venue issue. As will be discussed more fully below, in deciding whether Plaintiff has made a prima facie case of personal jurisdiction as to both Defendants, "the court must take all disputed facts and reasonable inferences in favor of the plaintiff." Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003) (emphasis added). The facts are found below pursuant to that standard.

### A.   The Parties

Triangle is a North Carolina corporation with its principal place of business in North Carolina. (Complaint ("Compl.") (Doc. 5) ¶ 2.) Triangle specializes in road construction projects. (See id. ¶ 7.) Triangle manages road construction projects throughout the southeast, to include in Georgia. (Pl.'s Resp. to Defs.' Mot. to Dismiss ("Pl.'s Resp.") (Doc. 13), Attach. 2,

- 2 -

Affidavit of Ronald Gray Kirkpatrick, Jr. ("Kirkpatrick Aff.")
(Doc. 13-2) ¶ 6.)

Rhino is a limited liability company organized under the
laws of Georgia; its sole member is Blackstone, who is also the
manager of the company. (Defs.' Br. in Supp. of Mot. to Dismiss
("Defs.' Br.") (Doc. 10), Ex. A, Affidavit of Lonnie Steven
Blackstone ("Blackstone Aff.") (Doc. 10-1) ¶ 2.) Blackstone
himself is a resident of Georgia. (Id. ¶ 4.) Rhino specializes
in the application of high-friction surface treatment ("HFST")[1]
in road projects. (Compl. (Doc. 5) ¶¶ 7, 11.) Rhino is not
registered to do business in North Carolina, nor does it have a
registered agent in North Carolina. (Blackstone Aff. (Doc. 10-1)
¶ 3.)

B. **Rhino's Subcontract with Triangle**

In 2016, Triangle had been selected as the general
contractor for a Georgia Department of Transportation ("GDOT")
Project (the "Project") that involved applying HFST, lane
markings, and protective barriers on portions of Georgia state
highways. (Compl. (Doc. 5) ¶¶ 7, 8.) Industry standards at the
time had recently changed, and the Federal Highway

---

[1] "[HFST] involves the application of aggregate to road
pavement using a binding agent to restore and/or maintain
pavement friction at existing or potentially high crash areas."
(Compl. (Doc. 5) ¶ 7 n.1.)

- 3 -

Administration began recommending machine application of HFST instead of hand application. (Pl.'s Resp. (Doc. 13) Attach. 1, Affidavit of Richard J. Brockman, Jr. ("Brockman Aff.") (Doc. 13-1) ¶¶ 6, 9.) Triangle did not have the HFST truck needed for machine application. (Id. ¶ 9)

Blackstone says "Triangle . . . initiated contact with Rhino, through me, in Georgia regarding the possibility of Rhino being Triangle's subcontractor . . . . I signed the Subcontract on behalf of Rhino in Georgia. Mr. Brockman signed . . . on behalf of Triangle . . . in Georgia." (Blackstone Aff. (Doc. 10-1) ¶¶ 6, 8.)

Brockman's affidavit, filed on behalf of Triangle, portrays events differently. Brockman states that Blackstone approached him about working for Rhino, and during that discussion the Project was mentioned. (Brockman Aff. (Doc. 13-1) ¶¶ 8-9.) Brockman notes that Blackstone was discussing other projects in the Atlanta area that Rhino was considering bidding, but after asking several questions about the Project, Blackstone asked Brockman if Triangle would hire Rhino to do the HFST work. (Id. ¶¶ 8, 10.) Brockman contends he had not "asked for or solicited Rhino's work on the Project" when Blackstone asked if Plaintiff would hire Rhino as a subcontractor on the Project. (Id. ¶ 10.) Brockman states that he "asked Mr. Blackstone to provide

- 4 -

Triangle with a quote for the Project. Mr. Blackstone then sent

me a quote for the Project, which I reviewed with

Mr. Kirkpatrick when I was at Triangle's headquarters in

Burlington, North Carolina." (Id. ¶¶ 11-12.)

Triangle accepted the bid that Blackstone provided for

Rhino. (Id. ¶ 12.) The subcontract between Rhino and Triangle

was signed in July 2016. (Kirkpatrick Aff. (Doc. 13-2) ¶ 9.) It

is undisputed that Blackstone signed the contract in Georgia.

(Brockman Aff. (Doc. 13-1) ¶¶ 14-15; Blackstone Aff. (Doc. 10-1)

¶ 8.) There is a dispute about who signed for Triangle and

where.

Brockman claims he forwarded the contract to Triangle's

headquarters in Burlington, North Carolina, for signature, and

that he did not sign it. (Brockman Aff. (Doc. 13-1) ¶¶ 14-15.)

Kirkpatrick, Triangle's president, claims he signed on behalf of

Triangle in North Carolina, and that Blackstone had already

signed for Rhino in Georgia. (Kirkpatrick Aff. (Doc. 13-2) ¶ 9.)

Rebecca Pugh, Triangle's Subcontracts & Accounts Payable

Manager, also averred that she witnessed Kirkpatrick sign the

subcontract at Triangle's headquarters in Burlington, North

Carolina. (Pl.'s Resp. (Doc. 13) Attach. 4, Affidavit of Rebecca

K. Pugh ("Pugh Aff.") (Doc. 13-4) ¶¶ 3, 6.) An executed copy has

an illegible signature above "Gray Kirkpatrick"; the witness on

- 5 -

the executed copy is "Becky Pugh." (Compl. (Doc. 5), Ex. A, Executed Subcontract ("Subcontract") (Doc. 5-1) at 13.)

Blackstone avers that after he signed the subcontract in Georgia, Brockman signed on behalf of Triangle and then took the fully executed contract with him to Burlington, North Carolina. (Blackstone Aff. (Doc. 10-1) ¶ 8.)[2]

Because "the court must take all disputed facts and reasonable inferences in favor of the plaintiff," Carefirst, 334 F.3d at 396, this court finds, for purposes of this motion, the following facts. Blackstone initially approached Rhino about acting as a subcontractor on the Project by inquiring of Brockman whether Triangle would hire Rhino as a subcontractor. Rhino later pursued the subcontract with Triangle by submitting a quote to Triangle. While the quote was physically submitted to Brockman in Georgia, it was intended as an offer to contract (subcontract) with Triangle, a North Carolina corporation. Based upon the quote, Triangle prepared a subcontract in North Carolina for Rhino to submit. Blackstone, on behalf of Rhino, signed the subcontract in Georgia and then sent that

---

[2] During a motion hearing, defense counsel stated that Blackstone was referring to another document that was part of the business relationship, not the subcontract. This court did not hold an evidentiary hearing to resolve this dispute of fact. However, Defendants did not respond to Plaintiff's affidavits and, at argument, Defendants did not appear to rely upon Blackstone's recollection or dispute this fact.

- 6 -

subcontract, whether through Brockman or otherwise, to Triangle in North Carolina. The contract was then executed by Kirkpatrick in North Carolina. From these facts, this court concludes that Rhino initiated the contractual relationship with Triangle in North Carolina and, in so doing, directed its activities to North Carolina in preparation to participate in road construction in Georgia by and through a subcontract with a North Carolina corporation. The court further finds, for the purposes of this motion, that the subcontract was finalized and formed at Triangle's headquarters in North Carolina.[3]

C. **The Project Begins and Stops**

The subcontract was fully executed on or about July 18, 2016; Triangle and Rhino's relationship ended when Rhino walked off the Project in September 2017. (Kirkpatrick Aff. (Doc. 13-2) ¶ 9; Compl. (Doc. 5) ¶ 25.)

---

[3] The parties have not briefed the question of whether Georgia law governs the subcontract to the point where this court can make a determination. The subcontract contains a provision that states it will be governed by the law governing the main contract. (Subcontract (Doc. 5-1) at 12, ¶ 29.) However, the portions of the GDOT contract provided do not contain choice-of-law provisions. (See generally Defs.' Reply (Doc. 14), Ex. A, GDOT Contract ("GDOT Contract") (Doc. 14-1).) The parties could have resolved this issue by providing the relevant portions of the GDOT contract and/or other evidence. Since they did not, the court cannot assume Georgia law governs the subcontract, though that seems likely.

Case 1:19-cv-00486-WO-JLW Document 24 Filed 04/30/20 Page 7 of 60

Blackstone visited Triangle's headquarters at some point before the Project began to coordinate with Triangle personnel. (Compl. (Doc. 5) ¶ 9.) During the Project, Triangle encouraged Blackstone to join a professional organization dedicated to promoting safety and HFST. (Brockman Aff. (Doc. 13-1) ¶ 25.) Blackstone attended national meetings to promote the machine application of HFST. (Id.)

Work began on the Project in Georgia. Rhino was supervised by several Triangle personnel, three of whom were based out of Burlington. (Kirkpatrick Aff. (Doc. 13-2) ¶ 10.) The parties dispute how Rhino communicated with Triangle. Triangle claims that Blackstone regularly communicated with multiple Triangle employees in North Carolina. (Brockman Aff. (Doc. 13-1) ¶¶ 26-27.) Triangle provided an email chain between Blackstone and Joe Coleman, a Triangle project manager who was based in North Carolina. (Kirkpatrick Aff. (Doc. 13-2) ¶ 10; id. at 4-13.) Rebecca Pugh also received at least one email from a Rhino employee. (Pugh Aff. (Doc. 13-4), Ex. A at 6.) Rhino regularly sent invoices for payment to personnel at Triangle's North Carolina headquarters. (Id. ¶ 8; Ex. A at 4-7.) More than half-a-million dollars in payments were issued from Triangle's headquarters to Defendants. (Id. ¶ 9.)

For Defendants' part, Blackstone claims he only communicated with Brockman, Triangle's manager in Georgia. (Blackstone Aff. (Doc. 10-1) ¶ 9.) For purposes of this motion, see Carefirst, 334 F.3d at 396, the court finds that Defendants communicated throughout the Project with multiple Triangle employees.

Eventually there were problems with the Project. Triangle alleges that Rhino's HFST truck broke down, Rhino improperly applied HFST, improperly cleaned up excess residue, and failed to properly test its work. (Compl. (Doc. 5) ¶¶ 18-22.) As a result, the Project fell behind by seventy-four days, and Triangle was assessed liquidated damages by GDOT. (Id. ¶¶ 23-24.) Rhino also used some of Triangle's equipment on the Project, some of which it damaged. (Brockman Aff. (Doc. 13-1) ¶ 28.)

As problems mounted with the Project, GDOT stopped making payments to Triangle, pending the correction of certain deficiencies. (Pl.'s Resp. (Doc. 13), Attach. 3, Affidavit of Adrian D. Bailey ("Bailey Aff.") (Doc. 13-3) ¶¶ 10-12.) In turn, Triangle stopped making payments to Rhino. (Id.)

Blackstone came to Triangle's headquarters in Burlington, North Carolina, in the fall of 2017 to discuss these issues; this was his second visit to Triangle's headquarters. (Bailey

- 9 -

Aff. (Doc. 13-3) ¶ 8.)[4] Blackstone was demanding payment. (Id. ¶ 12.) Triangle management told Blackstone they would not pay Rhino until Rhino complied with all GDOT requirements. (Id. ¶¶ 11-12.) Blackstone left Burlington, and the next day, on or about September 8, 2017, Rhino walked off the job. (Id. ¶ 13; Compl. (Doc. 5) ¶ 25.) Triangle had to cover the work by hiring other subcontractors. (Compl. (Doc. 5) ¶¶ 26, 28.) As a result of Rhino's failure to complete the work, Triangle was damaged in an amount exceeding $25,000. (Id.) Triangle's bonding capacity was affected by these damages, which in turn affected some of its projects in North Carolina. (Brockman Aff. (Doc. 13-1) ¶ 30.)

    D.  **Georgia Lawsuit**

    In addition to issues with the Project described above, Rhino and Triangle were both named as defendants in a negligence lawsuit after two people were injured on a Project road. The lawsuit, filed in a Georgia court in November 2018, alleges that a couple, the Nelsons, suffered injuries because Rhino "misapplied the epoxy during the [HFST process], used too much aggregate during the [HFST process], and failed to clean up

---

[4] Blackstone claims he traveled to Burlington on November 17, 2017. (Blackstone Aff. (Doc. 10-1) ¶ 10.) Triangle claims Blackstone came in September of 2017. (See Compl. (Doc. 5) ¶ 25; Bailey Aff. (Doc. 13-3) ¶¶ 8-13.)

- 10 -

excess aggregate." (Compl. (Doc. 5) ¶¶ 29-30.) The Georgia lawsuit alleges that Rhino, Triangle, Brockman, and another Triangle employee, were all negligent, and Triangle is strictly liable. (Id. ¶ 29.) As part of the present proceeding, Triangle seeks a declaratory judgment directing Rhino to indemnify and defend Triangle in the Georgia lawsuit pursuant to the subcontract. (Id. ¶¶ 33-36, 51.) As of April 2019, the Georgia lawsuit was still pending. (Id. ¶¶ 1, 36.)

**E.  Procedural History**

Triangle originally filed a state action for breach of contract, enforcement of a personal guaranty given by Blackstone, and declaratory judgment. (Compl. (Doc. 5) at 1, 6-9.) Defendants removed the Complaint to this court, invoking the court's diversity jurisdiction. (Petition for Removal (Doc. 1).) Defendants then filed a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) or alternatively for transfer under forum non conveniens.[5] (Doc. 8.) Defendants filed a supporting brief, (Doc. 10), Plaintiff responded, (Doc. 13), and Defendants replied, (Doc. 14). The

_____

[5] "The forum non conveniens doctrine is a common law doctrine now largely limited in federal court to cases where the alternative forum for litigating the dispute is outside of the United States." Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV, 569 F.3d 189, 200 (4th Cir. 2009). Though titled as a motion for transfer under that doctrine, Defendants are requesting a transfer under 28 U.S.C. § 1404(a).

court held a hearing on Defendants' motion, (Minute Entry 03/04/2020), after which the parties were given the opportunity to file supplemental briefing addressing the Fourth Circuit's recent decision in Fidrych v. Marriott International, Inc., 952 F.3d 124 (4th Cir. 2020). Both parties filed supplemental briefs. (Docs. 18, 19.) Plaintiffs also filed a suggestion of subsequently decided authority, a North Carolina Supreme Court decision. (Doc. 20.) Defendants responded to that suggestion. (Doc. 22.)[6] Finally, Plaintiffs filed notice of the fact that Defendant Rhino filed suit against Triangle in a separate action in the United States District Court for the Northern District of Georgia. (Doc. 21.) Defendants responded to that notice. (Doc. 23.)

The issue is now ripe for ruling. For the reasons stated herein, the court finds that it does have personal jurisdiction and that Defendants have not met their burden in establishing that transfer is appropriate.

## II.  LEGAL STANDARD OF REVIEW

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage

---

[6] The court's analysis is not altered by the subsequently suggested authority.

- 12 -

following such a challenge." Grayson, 816 F.3d at 267; Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). Such a challenge may be resolved by the court as a preliminary matter. Grayson, 816 F.3d. at 267. While this burden varies depending on the procedural posture of the case, "when the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." Id. at 268 (citations omitted); Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004); Human Res. Certification Inst. v. Human Res. Prof'l Ass'n, 453 F. App'x 349, 350 (4th Cir. 2011). "In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff." Carefirst, 334 F.3d at 396; Boykin Anchor Co. v. AT&T Corp., No. 5:10-CV-591-FL, 2011 WL 1456388 (E.D.N.C. Apr. 14, 2011); see also Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 560 (4th Cir. 2014) (refusing, at the prima facie stage, to discredit plaintiff's affidavits because they were contradicted by defendant). "A plaintiff makes a prima facie showing in this context when it 'present[s] evidence sufficient to defeat a motion for judgment as a matter

- 13 -

of law.'" Debbie's Staffing Servs., Inc. v. Highpoint Risk Servs., LLC, No. 1:17CV657, 2018 WL 1918603, at *2 (M.D.N.C. Apr. 20, 2018) (citations omitted).

"'Once a defendant presents evidence indicating that the requisite minimum contacts do not exist, the plaintiff must come forward with affidavits or other evidence in support of its position.'" Pathfinder Software, LLC v. Core Cashless, LLC, 127 F. Supp. 3d 531, 538 (M.D.N.C. 2015) (quoting Vision Motor Cars, Inc. v. Valor Motor Co., 981 F. Supp. 2d 464, 468 (M.D.N.C. 2013)); see also Wolf v. Richmond Cty. Hosp. Auth., 745 F.2d 904, 908 (4th Cir. 1984).

## III. PERSONAL JURISDICTION ANALYSIS

A federal district court may only assert personal jurisdiction over a nonresident defendant when two conditions are satisfied: "First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4(1)d, is construed "to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." Id. (citing Century Data

- 14 -

Sys., Inc. v. McDonald, 109 N.C. App. 425, 427, 428 S.E.2d 190, 191 (1993)). "Thus, the dual jurisdictional requirements collapse into a single inquiry as to whether the defendant has such 'minimal contacts' with the forum state that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. (quoting Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. & Placement, 326 U.S. 310, 316 (1945)).

Minimum contacts sufficient to establish personal jurisdiction over a nonresident defendant may exist by virtue of either specific jurisdiction or general jurisdiction. See Carefirst, 334 F.3d at 397.[7] Specific jurisdiction considers instances where the nonresident defendant's "contacts with the forum also provide the basis for the suit" whereas general jurisdiction considers instances where the defendant's contacts with the forum are so "continuous and systematic" as to provide support for jurisdiction over any cause of action. Id.

When determining if a defendant may be subject to the court's specific personal jurisdiction, "[f]airness is the touchstone of the jurisdictional inquiry," Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292,

_____

[7] Plaintiff does not contend Defendants are subject to general jurisdiction in North Carolina. (Pl.'s Resp. (Doc 13) at 10 n.3.)

301 (4th Cir. 2012), and a three-part test is employed to determine whether exercise of jurisdiction comports with due process. This test requires analyzing: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." ALS Scan, Inc. v. Dig. Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted). "For a [court] to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014); Universal Leather, 773 F.3d at 559 ("[Specific jurisdiction] may be established if the defendant's qualifying contacts with the forum state also constitute the basis for the suit.").

This court finds that it does have specific jurisdiction over the nonresident Defendants in this case. The court begins by finding that Defendants availed themselves of the protection of North Carolina's laws in initiating a relationship with a North Carolina corporation.

- 16 -

## A.    **Purposeful Availment**

"[I]n determining whether a foreign defendant has purposefully availed itself of the privilege of conducting business in a forum state, we ask whether 'the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there.'" Universal Leather, 773 F.3d at 559 (quoting Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989)). "The analysis must focus on the nature, quality, and quantity of the contacts, as well as their relation to the forum state." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 279 n.5 (4th Cir. 2009).

The personal jurisdiction analysis is "flexible." Universal Leather, 773 F.3d at 560. To help determine the nature and quality of the contacts, the Fourth Circuit has identified several factors for jurisdictional analysis in the business context.

> Those factors include, but are not limited to, an evaluation of: (1) "whether the defendant maintains offices or agents in the forum state;" (2) "whether the defendant owns property in the forum state;" (3) "whether the defendant reached into the forum state to solicit or initiate business;" (4) "whether the defendant deliberately engaged in significant or long-term business activities in the forum state;" (5) "whether the parties contractually agreed that the law of the forum state would govern disputes;" (6) "whether the defendant made in-person contact with the resident of the forum in the forum state regarding the

- 17 -

business relationship;" (7) "the nature, quality and
extent of the parties' communications about the
business being transacted;" and (8) "whether the
performance of contractual duties was to occur within
the forum."

Id. at 560 (quoting Consulting Eng'rs, 561 F.3d at 278). The
Fourth Circuit has identified some factors that "significantly
impact[]" a jurisdictional analysis, "including the fact that a
defendant 'initiated contact' with the plaintiff in the forum
state and 'repeatedly reached' into the forum state to transact
business during in-person visits there." Id. at 562 (quoting CFA
Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d
285, 295 & n.17 (4th Cir. 2009)). The third factor, whether the
defendant reached into the forum state to initiate or solicit
business, is given "special weight" by the Fourth Circuit. CFA
Inst., 551 F.3d at 295 n.17.

The Fourth Circuit has generally "concluded that a foreign
defendant has purposefully availed itself of the privilege of
conducting business in the forum state when the defendant
'substantially collaborated with a forum resident and that joint
enterprise constituted an integral element of the dispute.'"
Universal Leather, 773 F.3d at 560 (quoting Tire Eng'g, 682 F.3d
at 302). However, often "purposeful availment was lacking in
cases in which the locus of the parties' interaction was
overwhelmingly abroad." Tire Eng'g, 682 F.3d at 302. But even if

- 18 -

the locus is abroad, when the collaboration with a forum resident is ongoing and significant, then personal jurisdiction may still exist. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 465–66, 471 (1985); CFA Inst., 551 F.3d at 288; cf. Consulting Eng'rs, 561 F.3d at 276 (noting personal jurisdiction did not exist in case where business relationship never progressed past negotiation phase); Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 478 (4th Cir. 1993) (finding no personal jurisdiction for short-term, one-time contract between Maryland and Australian companies).

Taking the facts in a light most favorable to Plaintiff, the basic outlines of this case are that an out-of-forum-business, Rhino, initiated business negotiations with a North Carolina corporation, Triangle, and sought to enter into an ongoing relationship of more than a year. Rhino had been considering other business opportunities before it approached Triangle to work on the Project. Rhino conducted work outside the forum but was supervised by and corresponded extensively with Triangle in North Carolina.

Defendants' lack of business in North Carolina makes cases such as Universal Leather distinguishable, because, in Universal Leather, the foreign defendant targeted the forum itself with its tangible product. Universal Leather, 773 F.3d at 561. This

- 19 -

case is more like Burger King, CFA Institute, and Ellicott Machine in that the foreign defendant collaborated with a forum corporation, but the object of the collaboration, here a road construction project, was outside the forum. The court finds that a summary of those cases and others is the appropriate starting point to the analysis.

1. **Legal Background**

Similar to the present case, Burger King involved an out-of-state franchisee who entered a long-term relationship with a forum corporation but did not do business in the forum. In Burger King, the Court found a Michigan franchisee had purposefully availed himself of the protections of Florida law when he entered into a long-term contract with Florida-based Burger King. Burger King, 471 U.S. at 465-66, 471. The Court noted that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. at 475 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). If a defendant creates "'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there." Id. at 475-76 (quoting Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n,

- 20 -

339 U.S. 643, 647 (1950)). Because a defendant's "activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." Id. at 476. So long as a "commercial actor's efforts are 'purposefully directed' toward residents of another State," the absence of any physical contacts between the forum and defendant does not necessarily defeat personal jurisdiction. Id.

Applying those principles, the Burger King Court found "substantial record evidence" supporting the conclusion that the Michigan franchisee was subject to personal jurisdiction in Florida. Id. at 478. The defendant never visited Florida, nor did he have any offices there. The defendant's business was located in Michigan. Still, the Court held, the defendant had "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." Id. at 479–80 (quoting Travelers Health, 339 U.S. at 647). By doing so, the defendant had

> entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of [the defendant's] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and

- 21 -

nature" of his relationship to the company in Florida
can in no sense be viewed as "random," "fortuitous,"
or "attenuated."

Id. at 480 (quoting Hanson, 357 U.S. at 253). The defendant had
a "substantial and continuing relationship" with a Florida
corporation. Id. at 487. Further, contract documents included a
choice-of-law provision selecting Florida law, a fact the Court
found the Court of Appeals had given "insufficient weight" in
its own analysis. Id. at 481, 487. These facts, when combined,
meant it was not "fundamentally unfair" to subject the Michigan
defendant to personal jurisdiction in Florida. Id. at 487.

The Fourth Circuit, in CFA Institute, held that a court in
Virginia had personal jurisdiction over a defendant from India.
There, an Indian corporation traveled to Virginia to seek
approval from a Virginia corporation to use its trademarks and
other intellectual property in India. CFA Inst., 551 F.3d at
288. Though negotiations began in Virginia, they were concluded
in India, where the license agreement was reached. Id. Later,
Indian representatives returned at least one other time to
Virginia as "guests of honour" of the Virginia corporation. Id.
at 289. The relationship lasted thirteen years and included
correspondence back and forth between the parties. Id. One piece
of correspondence included a request from India requesting
expanded permission to use the Virginia corporation's

- 22 -

intellectual property. Id. The court held that "the quality and nature of [the defendant's] contacts with Virginia . . . support the court's exercise of personal jurisdiction over [the defendant] in Virginia." Id. at 294. These contacts included the defendant initiating the relationship and then "repeatedly reach[ing] into" the forum, actions manifesting the defendant's invocation of Virginia law and its protections. Id. at 295.

In contrast to those cases, the Fourth Circuit held in Ellicott Machine that a Maryland court did not have personal jurisdiction over an Australian defendant, despite the fact that it was the defendant who traveled to Maryland to solicit business. In Ellicott Machine, a Maryland company that designed and sold barges, was approached by an Australian company[8] to complete work on a barge in Australia. Ellicott Mach., 995 F.2d at 478. Despite the fact that it was the foreign defendant who first reached into the forum, the court noted that the contract would not be performed in Maryland, but Australia, and that the parties had no previous longstanding business relationship. Id.

---

[8] As noted in a later district court decision, courts "should exercise some additional caution when forcing foreign corporations to defend themselves in a foreign legal system in the United States." Frontline Test Equip., Inc. v. Greenleaf Software, Inc., 10 F. Supp. 2d 583, 589 (W.D. Va. 1998); Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 113 (1987)); Ellicott, 995 F.2d 474). This is not the case here, where the parties are all North Carolina or Georgia residents.

The contract itself was for a discrete task that would last only four months. Id. Distinguishing the facts from Burger King, the Fourth Circuit noted that this case involved a private corporation from a foreign country who performed a "single, short-term contract" in a different country. Id. at 478-79. Finally, the contract in Ellicott Machine did not include a forum selection or choice-of-law clause. Id. at 478.

Despite "insubstantial" contacts with Maryland, the Fourth Circuit did not rest its analysis on a minimum contacts analysis. Id. at 479. Instead, the court noted that "a more concerned focus" on another prong of the jurisdiction analysis was needed to determine if, "in spite of minimum contacts, the court's exercise of personal jurisdiction would comport with traditional notions of 'fair play and substantial justice.'" Id. The court ultimately concluded that "Maryland's exercise of personal jurisdiction over [the defendant] would not" comport with traditional notions of fair play and substantial justice. Id. In support of its conclusion, the court cited its due process analysis as well as "fundamental substantive social policies affecting international trade, business, and sovereignty concerns." Id. at 480.

District courts in the Fourth Circuit, applying these cases, also support the conclusion that an out-of-forum

defendant who initiates an ongoing, collaborative relationship with a forum plaintiff has purposefully availed themselves of the protection of the forum's laws. In Cortex Surveillance Automation, Inc. v. Security Integrators & Consultants, Inc., No. 1:05CV562, 2006 WL 994951 (M.D.N.C. Apr. 12, 2006), a court in this district found that it had personal jurisdiction over a Texas corporation who approached a North Carolina corporation about a licensing agreement. Id. at *1, *5.

The Texas corporation approached the Durham-based software company and entered into a licensing agreement that lasted roughly two years. Id. at *1, *3. At the end of the first two-year term, the agreement would be automatically renewed for a year unless notice of termination was given within thirty days. Id. Numerous software orders were placed by the Texas corporation, and payments totaling more than $100,000 were made to the North Carolina corporation. The North Carolina corporation also provided eighty man-hours of technical support from its North Carolina office. Id. at *3. The court noted that "[t]his type of agreement, which forecasts an ongoing relationship between the parties comprised of numerous transactions, strongly suggests personal jurisdiction." Id. The contract also contained a North Carolina choice-of-law provision. Id. at *4. "Finally, the visits by [the defendant's]

President to the Cortex facility in North Carolina distinguishes this situation from those concerning a simple contract for goods." Id. The court concluded that "[i]n the aggregate [defendant's] initiation of the relationship with Cortex, the visits by [the defendant's] president to North Carolina, the ongoing nature of the License Agreement, and the North Carolina choice of law provision support personal jurisdiction over [the defendant] in North Carolina." Id. at *5.

By contrast, in Johansson Corp. v. Bowness Construction Co., 304 F. Supp. 2d 701 (D. Md. 2004), a Maryland court found it did not have personal jurisdiction over a North Carolina contractor. Id. at 702. Johansson was a Maryland corporation that manufactured and installed custom cabinets; Bowness was a general contractor who built custom homes in North Carolina. Id. A North Carolina couple contracted with Bowness to build them a new home in North Carolina. Id. at 703. That couple, the Granthams, had seen Johansson's products and directed Bowness to contract with them to provide the cabinets for their home. Id.

Discussing Burger King, the court noted that a contract does not confer personal jurisdiction per se, but "[i]nstead, the court must perform an individualized and pragmatic inquiry into the surrounding facts such as prior negotiations, the terms of the contract, the parties' actual course of dealing, and

- 26 -

contemplated future consequences, in order to determine 'whether the defendant purposefully established minimum contacts within the forum.'" Id. at 705 (quoting Burger King, 471 U.S. at 479.) The court found that purposeful availment by Bowness was lacking for a number of reasons. Crucially, Bowness did not approach Johansson, but was directed to contract with them by another party. Id. at 706. Additionally, no agent or employee of Bowness ever physically traveled to Maryland to discuss the business relationship, and final negotiations were conducted in North Carolina, not Maryland. Id. at 705–06. Bowness had never attempted to solicit any business in the state of Maryland. Id. at 706. "Finally, the 'contemplated future consequences' stemming from the subcontract suggest that Bowness did not contemplate any future links to Maryland. Under the subcontract, the parties agreed to a one-time business relationship for a relatively short duration of approximately six months." Id. at 707 (citing Ellicott Mach., 995 F.2d at 478). The court concluded by pointing out that:

> In the instant case, a North Carolina corporation that has never reached out beyond the state of North Carolina reluctantly was drawn into a one-time, short-term relationship with a Maryland corporation, on a North Carolina project being constructed for a North Carolina client, in a subcontract largely negotiated in North Carolina which provided that North Carolina law would govern any resulting legal disputes.

Id. at 708–09.

(a) **Analysis of Purposeful Availment as to Rhino and Blackstone**

Turning back to the present case, the court finds the facts, as they are at this stage, are controlled by Burger King, Ellicott Machine, and CFA Institute. In this case, the court "must perform an individualized and pragmatic inquiry into the surrounding facts such as prior negotiations, the terms of the contract, the parties' actual course of dealing, and contemplated future consequences, in order to determine 'whether the defendant purposefully established minimum contacts within the forum.'" Johansson Corp., 304 F. Supp. 2d at 705 (quoting Burger King, 471 U.S. at 479.)

Defendants approached Triangle about the Project,[9] a relationship that lasted more than a year and would have lasted longer. Rhino had been considering other projects in the Atlanta area before it availed itself of the chance to work with Triangle. Defendants invested in new machinery to support the Project and perhaps other projects with Triangle. Rhino's contacts with North Carolina "can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" Burger King, 471 U.S.

---

[9] Even without accepting Triangle's version of the facts, it is clear that Defendants were well aware of what Triangle was, where it was located, and that any subcontract with Triangle would involve contacts with its home office in Burlington, North Carolina.

- 28 -

at 480. Instead, Rhino purposefully availed itself of the benefits of contracting with a North Carolina corporation as it "'substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.'" Universal Leather, 773 F.3d at 560 (quoting Tire Eng'g, 682 F.3d at 302). This court finds several facts significant in reaching this conclusion.

First, taking Triangle's averments as true, Defendants initiated contact with Triangle's representative in Georgia.[10] Though Defendants did not travel to North Carolina to negotiate the subcontract, they were clearly aware that Brockman was an agent of a North Carolina corporation, and Defendants intended to negotiate with that corporation. (Blackstone Aff. (Doc. 10-1) ¶ 7.) After Blackstone's bid was accepted, he traveled to Triangle's headquarters in North Carolina to coordinate the Project, (Compl. (Doc. 5) ¶ 9), an act that manifested Rhino and Blackstone's intent to avail themselves of doing business in North Carolina with Triangle. Even if Blackstone had not traveled to North Carolina, as noted in Burger King, there is no requirement that a defendant physically enter a forum in order

---

[10] The court notes again that it is not resolving factual disputes but is taking the facts and their inferences in a light most favorable to Plaintiff, as it is required to do at this stage. Carefirst, 334 F.3d at 396.

- 29 -

to establish a long-term relationship with forum residents.
Burger King, 471 U.S. at 476.

Second, like the franchisee in Burger King, the Indian company in CFA Institute, and the Texas corporation in Cortex Surveillance, Rhino benefited from its contractual relationship with Triangle. Blackstone told Brockman that Rhino was hoping to be granted other work in the Atlanta area. By engaging with Triangle, who had already been awarded the Project, Rhino secured a significant road construction subcontract. During the Project, Rhino also utilized some of Triangle's equipment, equipment they allegedly damaged. (Brockman Aff. (Doc. 13-1) ¶ 28.) At Triangle's urging, Blackstone also joined a national organization focused on the machine application of HFST and traveled nationally promoting his trade, another example of the benefit Defendants received from their relationship with Triangle. (Id. ¶ 25.)

Third, like the franchisee in Burger King, Rhino was subject to significant oversight by Triangle, a fact demonstrated by the detailed provisions of the subcontract. (See generally Subcontract (Doc. 5-1).) Triangle's supervision of Rhino personnel, conducted in large part from its North Carolina office, (Kirkpatrick Aff. (Doc. 13-2) ¶ 10), is akin to the technical support rendered by the Durham company in Cortex

- 30 -

Surveillance. The submission of invoices by Defendants to be paid by Triangle is a significant series of transactions, much like the software purchases in Cortex Surveillance. Rhino sent invoices for payment to personnel at Triangle's North Carolina headquarters. (Pugh Aff. (Doc. 13-4) ¶ 8; Ex. A at 4-7.) More than half-a-million dollars in payments were issued from Triangle's headquarters to Defendants. (Id. ¶ 9.) This continuous stream of billing and coordination is an example of Defendants "repeatedly reach[ing]' into the forum state to transact business" with Triangle. Universal Leather, 773 F.3d at 562; CFA Inst., 551 F.3d at 295.[11]

Fourth, unlike Ellicott Machine or Johansson Corporation, Rhino sought a relationship with Triangle that was more substantial than a single, short-term contract for independent work. Rhino was subcontracting to work collaboratively with Triangle over a period of more than a year. Though the length of a relationship is not dispositive, the relationship here is more substantial than in Ellicott Machine or Johansson Corporation. No deadline appears in the subcontract, but the parties' relationship lasted at least fourteen months before Rhino

---

[11] Though Triangle was paying for work done in Georgia, it was Defendants who sought the relationship so they could perform their services and then avail themselves of guaranteed payment from a North Carolina corporation.

allegedly walked off the job, (Compl. (Doc. 5) ¶¶ 8, 25), a
period of time similar to the initial licensing agreement in
Cortex Surveillance. Also, unlike Ellicott Machine and Johansson
Corporation, where companies were contracted to perform
discrete, independent tasks, Triangle supervised and directed
Rhino's work throughout the Project. Three of Defendants' four
Triangle supervisors were based in North Carolina. (Kirkpatrick
Aff. (Doc. 13-2) ¶ 10.) Along with the supervision, Rhino also
communicated regularly with Triangle's headquarters about other
matters related to the Project. Rhino sent invoices, updates,
and other communications back to Triangle's home office in North
Carolina. (Brockman Aff. (Doc. 13-1) ¶¶ 26-27; Kirkpatrick Aff.
(Doc. 13-2) ¶ 12, Exs. A, B at 4-13; Pugh Aff. (Doc. 13-4), Ex.
A at 6.)

The subcontract in this case is distinguishable from the
relationships in some other cases, see, e.g., CFA Inst., 551
F.3d at 288 (13 years), in that it lasted a shorter period of
time. That distinction, however, is not dispositive. As
demonstrated by Cortex Surveillance, an agreement of only a
couple of years is sufficient if it evinces the parties' desire
to engage in an even longer relationship and there is
significant collaboration between the parties. In this case,
there was an ongoing, collaborative relationship to complete the

- 32 -

Project.[12] Brockman also noted that Rhino purchased an HFST truck after Blackstone and Brockman spoke about the Project. (Brockman Aff. (Doc. 13-1) ¶¶ 9–12.) Triangle did not want to buy its own HFST truck, and the genesis of the parties' relationship was Rhino filling Triangle's HFST requirements by investing in an HFST truck. (Id. ¶ 9.) As stated by the Burger King Court, "a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" Burger King, 471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316–17 (1943)). Though the subcontract was more limited in time than some other agreements,

---

[12] The court does not consider the parties' dealing and conduct outside the Project for purposes of this specific jurisdiction analysis. Brockman's "impression" is that Rhino saw its relationship as a way to expand its regional footprint. (Brockman Aff. (Doc. 13-1) ¶ 23.) As an example, Brockman cites Rhino's collaboration with Triangle in bidding on a road project in South Carolina. (Id.) Rhino actually did do work with Triangle on a project in Virginia. (Kirkpatrick Aff. (Doc. 13-2) ¶ 7; Pugh Aff. (Doc. 13-4) ¶ 11.) Rhino also submitted estimates for Triangle bids on projects in North Carolina, though Triangle was not awarded those contracts. (Brockman Aff. (Doc. 13-1) ¶ 24.) Though these contacts could be seen as part of the Project's "contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," Burger King, 471 U.S. at 479, the court ultimately concludes that Defendants' conduct outside the Project is not "suit-related" for specific jurisdiction purposes, see, e.g., Walden, 571 U.S. at 284; Tire Eng'g, 682 F.3d at 301. Though the court does not factor these allegations into its analysis, it does note that they do not undercut the court's conclusion.

Defendants' decision to invest in new machinery is suggestive of an "intermediate step" to a longer relationship involving future projects. See Ellicott Mach., 995 F.2d at 478 (noting that, unlike the defendant in Burger King, the defendant there "completed the assembly contract in four months, and there is no indication that any future contracts were planned between the parties").

Fifth, unlike Johansson Corporation or Burger King, but like Cortex Surveillance, Blackstone traveled to Triangle's headquarters on two separate occasions, first to finalize details about the Project, and second to demand payment. (Compl. (Doc. 5) ¶ 9; Bailey Aff. (Doc. 13-3) ¶ 8.) These two trips demonstrate Defendants' willingness to avail themselves of doing business in North Carolina, which carries a corresponding duty to defend in this state should the need arise. See CFA Inst., 551 F.3d at 294 (noting that defendants were only known to have traveled to forum twice in thirteen years); Triad Motorsports, LLC v. Pharbco Mktg. Grp., Inc., 104 F. Supp. 2d 590, 598 (M.D.N.C. 2000).

In contrast to the analysis above, Defendants contend personal jurisdiction is not present since they never purposefully availed themselves of the protection of North Carolina's laws. Defendants argue that when analyzing the facts

- 34 -

under the eight factors enumerated in Universal Leather, personal jurisdiction is found lacking. See Universal Leather, 773 F.3d at 560. Defendants argue that they "do not maintain offices or agents in North Carolina; they do not own property in North Carolina; they have not reached into North Carolina to solicit or initiate business; and they have not deliberately engaged in significant or long-term business activities in North Carolina." (Defs.' Br. (Doc. 10) at 10.) They further argue that the subcontract does not specify that North Carolina law governs disputes and that the performance under the subcontract was to occur in Georgia. (Id. at 9-10.)

This court agrees that the subcontract does not provide that North Carolina law governs,[13] and the actual construction work under the subcontract was to occur in Georgia. Nevertheless, this court weighs the Universal Leather factors differently.

The personal jurisdiction analysis is "flexible" and must look at the nature and quality of the contacts. See Universal Leather, 773 F.3d at 560. As noted, the third Universal factor,

---

[13] The absence of a choice-of-law clause is not dispositive. "The Supreme Court has held that forum-selection clauses are relevant, though not dispositive, of the question whether a defendant has purposefully availed himself of a particular forum." Shider v. Bridgeport Music, Inc., Civil Action No. 8:13-cv-00527-AW, 2013 WL 5487868, at *5 (D. Md. Sept. 30, 2013) (citing Burger King, 471 U.S. at 481-82).

- 35 -

which party initiated contact, is given "special weight." Id. at
562. This court has found, on the record before it, that Rhino
initiated the contractual relationship with Triangle in North
Carolina and, in so doing, directed its activities to North
Carolina in preparation to participate in road construction in
Georgia.

Further, though Rhino never performed any HFST work in
North Carolina, it did work to create a collaborative
relationship with Triangle in the form of the subcontract, a
fact that supports the fourth factor, whether the defendant
deliberately engaged in long-term business activities in the
forum state. Blackstone came to Triangle's office twice, a fact
relevant under the sixth factor, whether defendant came to the
forum in person. Finally, the seventh factor, "the nature,
quality and extent of the parties' communications about the
business being transacted," is supported by the parties'
communications.[14] Rhino regularly sent invoices for payment to
personnel at Triangle's North Carolina headquarters. (Pugh Aff.
(Doc. 13-4) ¶ 8; Ex. A at 4-7.) More than half-a-million dollars

---

[14] Defendants argue that communications sent to Brockman,
Triangle's agent in Georgia, were not targeted at the forum
since Brockman was in Georgia. (Defs.' Reply (Doc. 14) at 3
n.2.) Even if that were true for every communication, which it
is not, Defendants were aware that Brockman forwarded requests
and communications to Triangle's office in North Carolina. (See
id.)

in payments were issued from Triangle's headquarters to
Defendants. (Id. ¶ 9.) Supervision of the project was conducted
by four supervisors, three of whom supervised from Triangle's
North Carolina headquarters. (Kirkpatrick Aff. (Doc. 13-2)
¶ 10.) Several Universal Leather factors, including the one
given "special weight," support a finding of personal
jurisdiction.

Defendants also cite several cases that they contend
support the conclusion that this court does not have personal
jurisdiction. Those cases, however, all contain one critical
distinction from the facts presently before this court: in those
cases, it was the plaintiffs who reached beyond their states and
initiated contact. See Diamond Healthcare of Ohio, Inc. v.
Humility of Mary Health Partners, 229 F.3d 448, 451 (4th Cir.
2000); Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp.,
825 F. Supp. 2d 664, 682 (M.D.N.C. 2011); Worldwide Ins.
Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV00906,
2006 WL 288422, at *1 (M.D.N.C. Feb. 6, 2006); Sea-Roy Corp. v.
Parts R Parts, Inc., No. 1:94CV00059, 1996 WL 557857, at *5
(M.D.N.C. July 30, 1996).

As counsel pointed out during oral argument, the facts in
Diamond Healthcare are similar to the facts in this case. In
Diamond Healthcare, the Fourth Circuit affirmed a Virginia

- 37 -

district court's conclusion that it did not have personal jurisdiction over an Ohio defendant. Diamond Healthcare, 229 F.3d at 449. Diamond, a Virginia corporation, entered into a contract with an Ohio corporation to provide services to be performed almost exclusively in Ohio. The contract was signed in Virginia, and Diamond exercised some management from Virginia, although the extent of that appears to have been limited to its own employees in Ohio and not with the defendant.[15]

However, certain facts distinguish Diamond Healthcare from this case. First, unlike this case, Diamond initiated contact with "HMH Partners in Ohio to solicit HMH Partners' purchase of

---

[15] The Diamond opinion outlines a number of apparent management responsibilities of Diamond, such as employing directors, furnishing staff, and recruiting, orienting, and training staff. Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 451 (4th Cir. 2000). However, the opinion later states that

> Diamond Healthcare emphasizes the frequent communications and management activities between its Virginia office and Project NuStart in Boardman, Ohio. But these communications and management activities were principally between Diamond Healthcare's employees in Richmond and its own employees at Project NuStart . . . . Diamond Healthcare provides no authority for the proposition that interactions between its headquarters and its own employees in the field, across state lines, may form a "sufficiently substantial" connection with an out-of-state entity . . . .

Id. at 452. In this case, by contrast, Rhino communicated directly with Triangle on a number of different issues as described herein.

- 38 -

Diamond Healthcare's capacity for managing a partial-hospitalization program. . . . Formed in these circumstances, the contract represents the product of HMH Partners' favorable response to Diamond Healthcare's unsolicited invitation for performance in Ohio . . . ." Id. at 451. Here, the subcontract represents the product of Rhino's solicitation of Triangle and subsequent quote and offer to subcontract with a North Carolina corporation. The fact that Rhino directed the contract negotiations toward North Carolina, and the fact that a foreign corporation directed its offer to contract and resulting contractual obligations to a forum corporation, are both facts given "special weight" by the Fourth Circuit. Universal Leather, 773 F.3d at 562. The fact that in Diamond Healthcare it was the plaintiff Virginia corporation who initiated contact in a foreign state, Ohio, is a point courts have relied upon in distinguishing other cases. See Manley v. Air Canada, 753 F. Supp. 2d 551, 560 n.3 (E.D.N.C. 2010); Cambata Aviation, Inc. v. Kansas City Aviation Ctr., Inc., No. 5:01CV00062, 2001 WL 1274426, at *2 (W.D. Va. Oct. 22, 2001); see also Rio Grande Games, Inc. v. Hans IM Glück Verlags GmbH, No. CIV 13-985 JAP/KBM, 2014 WL 12594214, at *10 (D.N.M. Mar. 20, 2014).

"Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State,

not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." Walden, 571 U.S. at 286 (quoting Burger King, 471 U.S. at 475). The defendants in Diamond Healthcare were approached by a corporation who happened to be based in Virginia; however, in this case, Defendants approached Triangle, a North Carolina corporation.

Second, in Diamond Healthcare, "the principal part of Diamond Healthcare's performance was required in Boardman, Ohio, virtually all of HMH Partners' performance was required there." Diamond Healthcare, 229 F.3d at 451. While the Project in this case was performed in large part in Georgia, Plaintiff has come forward with evidence that a substantial part of the contractual work and oversight between Triangle and Rhino was performed in North Carolina. (Compl. (Doc. 5) ¶ 9; Kirkpatrick Aff. (Doc. 13-2) ¶¶ 9-10; Pugh Aff. (Doc. 13-4) ¶¶ 8-9, Ex. A at 4-7.) Defendants have not provided facts which might suggest the work in North Carolina was more limited than that described by Plaintiff, nor have Defendants provided facts which might require the court to find the work in Georgia was more substantial than that of execution of the subcontract and instruction from North Carolina. The court therefore finds that

Diamond Healthcare is distinguishable from the facts at issue here.

In conclusion, the court finds that Defendants purposefully availed themselves of the protection of North Carolina's laws when they initiated an extended, collaborative relationship by virtue of a subcontract with a North Carolina corporation. See Cortex Surveillance, 2006 WL 994951, at *5; see also Dynamic Educ. Sys. Inc. v. Heritage Servs. Corp., No. CV-19-04690-PHX-SRB, 2019 WL 7841827, at *6 (D. Ariz. Nov. 18, 2019) ("Even taken on their own, the subcontracts evince an intent to sustain a long-term relationship: the Jacksonville Subcontract was to run for a period of nearly two years, and the Bamberg Subcontract was to run for over two years."); cf. O'Brien Constr., Inc. v. Miller, Case No. 1:19cv1451, 2020 WL 1187259, at *7 (N.D. Ohio Mar. 12, 2020). On the facts before the court, Defendants sought and entered a contractual relationship with a North Carolina corporation. "Fairness is the touchstone of the jurisdictional inquiry," Tire Eng'g, 682 F.3d at 301, and the "key issue in a specific jurisdiction case [is] whether 'the defendant purposefully directed [its] activities at residents of the forum,'" Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 142 (4th Cir. 2020) (quoting Burger King, 471 U.S. at 472). The first prong of the specific jurisdiction test is satisfied.

**B.   Claims Arising out of Activity in the State**

To satisfy the second prong in the specific jurisdiction analysis, the plaintiffs must allege facts showing that their claim arose out of the defendant's activities directed at the forum state. Tire Eng'g, 682 F.3d at 303. If the activity in the forum state is the "genesis of the dispute," then the prong is met. Id. The appropriate question, however, "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." Walden, 571 U.S. at 290. "The Supreme Court has also characterized the arising-out-of prong as akin to proximate causation." Broadus v. Delta Air Lines, Inc., 101 F. Supp. 3d 554, 560–61 (M.D.N.C. 2015) (citing Burger King, 471 U.S. at 475). "A plaintiff's claims similarly arise out of activities directed at the forum state if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Tire Eng'g, 682 F.3d at 303. If a visit by the defendant to the forum led to the dispute, that fact is sufficient to satisfy the second prong. See CFA Inst., 551 F.3d at 295 (noting that the defendant's visit to the plaintiff's office in Virginia was the "genesis of [this] dispute").

Here, Defendants corresponded extensively with Triangle in
North Carolina, correspondence that gave rise to the
relationship between the parties. (Brockman Aff. (Doc. 13-1)
¶¶ 12-15, 26-27.) This communication included the transmission
of the original quote and resulting subcontract to Triangle's
offices in North Carolina for final signature. (Pugh Aff. (Doc.
13-4) ¶ 6; Subcontract (Doc. 5-1) at 13.) Further, Blackstone's
visit to Triangle in Fall 2017 led directly to Rhino's decision
to leave the job prematurely. (Bailey Aff. (Doc. 13-3) ¶¶ 12-13;
Blackstone Aff. (Doc. 10-1) ¶ 10.) Both of these facts satisfy
the second prong of the jurisdictional inquiry.[16]

## C. **Constitutional Reasonableness**

Finally, regarding the third prong of the specific
jurisdiction test, "[o]nce it has been decided that a defendant
purposefully established minimum contacts within the forum
State, these contacts may be considered in light of other
factors to determine whether the assertion of personal

---

[16] After considering the parties' supplemental briefing,
(Docs. 18, 19), the court finds that its conclusion regarding
the second prong of the jurisdictional inquiry is not altered by
the Fourth Circuit's recent decision in Fidrych v. Marriott
International, Inc., 952 F.3d 124 (4th Cir. 2020). In that case,
the Fourth Circuit noted it was a "difficult question" to
determine if a plaintiff's injury incurred at a Marriott hotel
in Italy arose from Marriott's use of website booking and
advertising in South Carolina, the plaintiff's home. Id. at 139.
The court did not resolve the issue. Id. at 140.

- 43 -

jurisdiction would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co., 326 U.S. at 320). The "Constitutional Reasonableness" prong "of the analysis 'ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent.'" Tire Eng'g, 682 F.3d at 303 (citation omitted). In making this determination, the court should consider:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies."

Consulting Eng'rs, 561 F.3d at 279.

In this case, almost all the factors point to the constitutional reasonableness of North Carolina serving as the forum. Defendants would undoubtedly face some burden in litigating in North Carolina, but that burden has not been shown to be so great as to be constitutionally unfair. See Ellicott Mach., 995 F.2d at 479. Defendants traveled to North Carolina, and beyond to Virginia, in support of their business relationship with Triangle, (see Brockman Aff. (Doc. 13-1) ¶ 20; Bailey Aff. (Doc. 13-3) ¶ 8), a fact suggesting that the burden on Defendants in traveling to North Carolina is not unreasonable

- 44 -

nor unconstitutional. Further, North Carolina has an interest in
protecting its corporations from harm allegedly caused by
foreign entities. Triangle has an interest in obtaining relief
close to its home office. The last two factors support
jurisdiction in both North Carolina and Georgia, and therefore
do not clearly advocate either way. The factors support the
conclusion that requiring Defendants to litigate in North
Carolina would not make the process "so gravely difficult and
inconvenient as to place the defendant at a severe disadvantage
in comparison to his opponent." Tire Eng'g, 682 F.3d at 303.

> D.      **Personal Jurisdiction Conclusion**

"In the aggregate [Defendants'] initiation of the
relationship with [Triangle], the visits by [Blackstone] to
North Carolina, [and] the ongoing nature of the [the Project]
. . . support personal jurisdiction over [Defendants] in North
Carolina." Cortex Surveillance, 2006 WL 994951, at *5. "Where a
defendant . . . has created continuing obligations between
himself and residents of that state, jurisdiction is reasonable
because the defendants have manifestly availed themselves of the
privilege of conducting business within that jurisdiction."
Delta-T Corp. v. Pac. Ethanol, Inc., Civil Action No. 3:08CV524,
2009 WL 77869, at *6 (E.D. Va. Jan. 7, 2009) (citing Burger

King, 471 U.S. at 471–76). Defendants' Motion to Dismiss under Rule 12(b)(2) will therefore be denied.

## IV. TRANSFER ANALYSIS

Defendants alternatively move for transfer under 28 U.S.C. § 1404(a) to the United States District Court for the Northern District of Georgia. (Defs.' Br. (Doc. 10) at 1.) For the reasons stated herein, the motion to transfer to the Northern District of Georgia will be denied without prejudice.

"'The moving party bears the burden of establishing that transfer to another venue is proper.'" IHFC Properties, LLC v. APA Mktg., Inc., 850 F. Supp. 2d 604, 622 (M.D.N.C. 2012) (quoting AAI Corp. v. Applied Geo Techs., Inc., Civil No. JKB-11-608, 2011 WL 3678903, at *2 (D. Md. Aug. 22, 2011)). When a district court weighs the transfer factors, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984) (emphasis added) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). When a court is considering whether to transfer to another venue, it should consider the following factors:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate;

- 46 -

(5) enforceability of a judgment, if one is obtained;
(6) relative advantage and obstacles to a fair trial;
(7) other practical problems that make a trial easy,
expeditious, and inexpensive; (8) administrative
difficulties of court congestion; (9) local interest
in having localized controversies settled at home;
(10) appropriateness in having a trial of a diversity
case in a forum that is at home with the state law
that must govern the action; and (11) avoidance of
unnecessary problems with conflicts of laws.[17]

Pet Specialties, LLC v. Navisiontech, Inc., No. 1:18-CV-00985,

2019 WL 4773623, at *9 (M.D.N.C. Sept. 30, 2019) (quoting Plant

Genetic Sys., N.V. v. Ciba Seeds, 933 F. Supp. 519, 527

(M.D.N.C. 1996)); see also Atl. Marine Const. Co. v. U.S. Dist.

Ct. for W. Dist. of Tex., 571 U.S. 49, 63 n.6 (2013); IHFC

Properties, 850 F. Supp. 2d at 622. Some courts in this circuit

have included "the pendency of a related action" as a factor to

---

[17] The Fourth Circuit has enunciated a similar, but shorter
test listing the following four factors: "(1) the weight
accorded to plaintiff's choice of venue; (2) witness convenience
and access; (3) convenience of the parties; and (4) the interest
of justice." Trs. of the Plumbers & Pipefitters Nat'l Pension
Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir.
2015). In an earlier case, the Fourth Circuit offered a more
expansive test. See Landers v. Dawson Constr. Plant, Ltd., Nos.
98-2709, 98-2763, 1999 WL 991419, at *2 (4th Cir. Nov. 2, 1999)
(listing several additional factors).

In either test, each of the factors is inherently or
expressly incorporated into the longer test that is regularly
used by district courts in this circuit. See Charles v. Bradley,
No. 5:08-CV-124-F, 2009 WL 1076771, at *2 (E.D.N.C. Apr. 21,
2009); OptimumPath, LLC v. Belkin Int'l, Inc., Civil Action No.
4:08-cv-317-TLW-TER, 2009 WL 10697106, at *2 (D.S.C. Mar. 30,
2009); Culp v. Bridge Terminal Transp., Inc., No. 3:07-cv-00354,
2008 WL 2568148, at *1 (W.D.N.C. June 24, 2008); B&G Equip. Co.
v. J.T. Eaton & Co., Civil Action No. WMN 06-1363, 2006 WL
2813886, at *2 (D. Md. Sept. 27, 2006).

- 47 -

consider in the transfer analysis. <u>Ion Beam Applications, S.A.</u>
<u>v. Titan Corp.</u>, 156 F. Supp. 2d 552, 560 (E.D. Va. 2000); <u>see</u>
<u>also</u> <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Chua</u>, No. 90
Civ. 7491 (LLS), 1991 WL 60385, at *2 (S.D.N.Y. Apr. 4, 1991)
("Transfer is particularly appropriate where there is a pending
lawsuit in the transferee district involving the same facts,
transactions, or occurrences.").

District courts should "weigh the relevant factors and
decide whether, on balance, a transfer would serve 'the
convenience of parties and witnesses' and otherwise promote 'the
interest of justice.'" <u>Atl. Marine</u>, 571 U.S. at 62–63 (quoting
28 U.S.C. § 1404(a)). "When deciding a motion to transfer, it is
important to bear in mind that such a motion should not be
granted if it simply shifts the inconvenience from the defendant
to the plaintiff." <u>Plant Genetic Sys.</u>, 933 F. Supp. at 527.

### A.    <u>Plaintiff's Choice of Forum</u>

The court begins with an analysis of the first factor,
Plaintiff's choice of forum.

As noted above, "'unless the balance is <u>strongly in favor</u>
of the defendant, the plaintiff's choice of forum should rarely
be disturbed." <u>Collins</u>, 748 F.2d at 921 (4th Cir. 1984)
(emphasis added) (quoting <u>Gulf Oil</u>, 330 U.S. at 508). "[C]ourts
afford less weight to a plaintiff's choice if none of the

conduct creating the cause of action occurred in the forum, and the forum has no connection with the cause of action." Sweeney v. Pa. Nat'l Mut. Cas. Ins. Co., No. 1:05CV00931, 2007 WL 496699, at *2 (M.D.N.C. Feb. 13, 2007), as amended (Feb. 27, 2007); Dicken v. United States, 862 F. Supp. 91, 92–93 (D. Md. 1994). However, "[t]he cases where a plaintiff's choice of forum becomes neutral typically involve a plaintiff choosing a state in which none of the operative events took place and where none of the parties reside and often involve great distances between the fora." WPB Partners, LLC v. Old Republic Nat'l Title Ins. Co., No. 5:12-CV-132-F, 2013 WL 395112, at *5 (E.D.N.C. Jan. 31, 2013) (collecting cases).

The Middle District of North Carolina has a connection to this case. Triangle's home offices are located in Alamance County, North Carolina. (Compl. (Doc. 5) ¶ 2.) The subcontract was signed and finalized at Triangle's home headquarters in North Carolina. (Kirkpatrick Aff. (Doc. 13-2) ¶ 9; Pugh Aff. (Doc. 13-4) ¶ 6; Subcontract (Doc. 5-1) at 13.) Supervision of Rhino was conducted by Triangle employees located in North Carolina. (Kirkpatrick Aff. (Doc. 13-2) ¶ 10.) Checks were issued from Triangle's headquarters in North Carolina to pay for Rhino's services. (Pugh Aff. (Doc. 13-4) ¶¶ 8–9.) When Rhino

walked off the job, it affected Triangle's bonding capacity in North Carolina.

Of course, there are significant connections to Georgia as well. The Project, a GDOT project, took place in Georgia. (Compl. (Doc. 5) ¶ 7; GDOT Contract (Doc. 14-1).) Both Triangle's and Rhino's performance under the GDOT contract and the subcontract took place in Georgia. (Compl. (Doc. 5.) ¶¶ 7, 11.) Rhino's alleged deficiencies all took place in Georgia, to include negligent application of HFST, Rhino equipment breaking down, and Rhino employees damaging Triangle equipment. (Id. ¶¶ 18-24.) Invoices were generated by Rhino for work in Georgia, sent to Triangle's headquarters in North Carolina, and then checks were issued by Triangle and sent back to Georgia for the work done by Rhino's employees in Georgia. (Brockman Aff. (Doc. 13-1) ¶ 26.) Though it might have been precipitated by Blackstone's visit to Triangle's headquarters in North Carolina, Rhino's act of "walking away" from the Project also occurred in Georgia. (Id. ¶ 25; Bailey Aff. (Doc. 13-3) ¶¶ 8-13.)

Despite these connections to Georgia, however, the present case is not one where a plaintiff has chosen a foreign forum where "none of the operative events took place." WPB Partners, 2013 WL 395112, at *5. Plaintiff's initial choice of forum should, therefore, be given significant weight.

B.   **Other Factors**

The court now addresses the other factors, finding that though some factors might support transfer, Defendants have failed to show that they "strongly" support transfer when compared to Plaintiff's initial choice of forum.

1.   **Local Interest**

Factor nine, local interest in having localized controversies settled at home, is the factor that most strongly supports transfer, so the court begins there.

"Courts have determined that litigation should take place in the federal judicial district or division with the closest relationship to the operative events." Speed Trac Techs., Inc. v. Estes Express Lines, Inc., 567 F. Supp. 2d 799, 804 (M.D.N.C. 2008); Weishaupt v. Boston Coll., No. 1:11-cv-1122, 2012 WL 1439030, at *5 (M.D.N.C. Apr. 24, 2012). If a case involves a contract or business relationship that primarily concerns one forum, that forum should resolve the suit. See La Casa Real Estate & Inv., LLC v. KB Home of S.C., Inc., No. 1:09CV895, 2010 WL 2649867, at *4 (M.D.N.C. June 30, 2010); IHFC Properties, 850 F. Supp. 2d at 624; Piedmont Hawthorne Aviation, Inc. v. TriTech Envtl. Health & Safety, Inc., 402 F. Supp. 2d 609, 616 (M.D.N.C. 2005); cf. Universal Furniture Int'l, Inc. v. Frankel, No. 1:08CV395, 2009 WL 2853695, at *5 (M.D.N.C. Aug. 27, 2009)

- 51 -

(noting that North Carolina had a substantial economic interest in the suit and the allegedly improper acts occurred in North Carolina, meaning transfer was not appropriate); Xpress Motorsports, Inc. v. Sundance Motorsports, LLC, No. 1:05CV143, 2006 WL 267183, at *2 (M.D.N.C. Jan. 30, 2006) (finding transfer not appropriate since business relationship between North Carolina plaintiff and out-of-state defendant resulted in a significant amount of business being done in North Carolina). Likewise, if acts or omissions primarily occurred in one state, that forum should resolve the dispute, even if the accident occurred elsewhere. See Weishaupt, 2012 WL 1439030, at *5. ("Although the accident occurred in this district, the theory of liability rests almost exclusively on alleged acts and omissions in Massachusetts."). The fact that a plaintiff corporation's home office is located in the forum sometimes does not overcome the local interest in having local harms resolved by local courts. See Akers v. Norfolk & W. Ry. Co., 378 F.2d 78, 79 (4th Cir. 1967) (finding court abused its discretion in not transferring to forum where injuries occurred, despite fact that plaintiff corporation's home office was located in transferor forum).

The dispute in this case arose out of a GDOT project to upgrade Georgia roads that involved at least one Georgia

- 52 -

subcontractor. Though the subcontract was finalized in North
Carolina, it is connected to a larger contract in which the
state of Georgia has a significant interest. (Compl. (Doc. 5)
¶ 7; GDOT Contract (Doc. 14-1).) Furthermore, Triangle seeks
indemnity and defense against a Georgia negligence lawsuit that
was still pending at the time of this present action was filed.
(Compl. (Doc. 5) ¶¶ 29-30.)

North Carolina has a significant interest in its
corporations, business was transacted in North Carolina, and the
Project was supervised from North Carolina. Still, the Project
was physically located in Georgia, it was governed by a GDOT
prime contract, and the Nelson's lawsuit was pending in a
Georgia court for Georgia injuries. But see Netalog, Inc. v.
Tekkeon, Inc., No. 1:05CV00980, 2007 WL 534551, at *6 (M.D.N.C.
Feb. 15, 2007) (noting that a North Carolina plaintiff should be
able to sue in its home forum when the defendant directed its
activities at North Carolina). As Justice Jackson said, "[t]here
is a local interest in having localized controversies decided at
home." Ferens v. John Deere Co., 494 U.S. 516, 530 (1990)
(quoting Gulf Oil, 330 U.S. at 508-09). Despite North Carolina's
own substantial interest, factor nine favors transfer.

- 53 -

## 2    <u>Ease of Access to Sources of Proof</u>

The second factor, relative ease of sources of proof, slightly supports transfer. "In weighing this factor, courts consider the relative ease of access to witnesses and other evidence for trial. Courts also examine the number and materiality of witnesses." <u>Speed Trac Techs.</u>, 567 F. Supp. 2d at 804 (internal citations omitted). A breach of contract action between two parties inherently involves evidence on both sides, but the central issue of who breached the contract and when favors one forum over the other. <u>IHFC Properties</u>, 850 F. Supp. 2d at 623 (finding this factor weighed in favor of transfer when central questions required access to parties in other forum); <u>Piedmont Hawthorne Aviation</u>, 402 F. Supp. 2d at 616 (finding transfer appropriate when parties who negotiated contract largely located in another forum).

Triangle points out that its records are located in North Carolina. (Pl.'s Resp. (Doc. 13) at 23.) Even assuming the documents are all in North Carolina, the site of the underlying lawsuit and the location where HFST was applied, by Rhino, is in Georgia. Still, Plaintiff's claims are all contract-based, making physical evidence less central to the claims. GDOT records, and possibly personnel, would be involved, though Defendants have not pointed to any specific records or personnel

- 54 -

that would be needed. The second factor, ease of access to sources of proof, slightly favors transfer.

### 3. Availability of Compulsory Process and Witnesses

The third factor, availability of compulsory process, does not favor transfer at this point, because Defendants have not met their burden on this issue. Presumably the majority of workers who were on the Project reside in or close to the Northern District of Georgia. However, Defendants have not named a witness who cannot or is not willing to travel to this district. "To carry its burden 'the moving party must demonstrate whether its witnesses are willing to travel to a foreign jurisdiction.'" IHFC Properties, 850 F. Supp. 2d at 623 (alterations in original) (quoting Samsung Elecs. Co., Ltd. v. Rambus, Inc., 386 F. Supp. 2d 708, 719 (E.D. Va. 2005)). Though Defendants contend, not unreasonably, that more witnesses are located in Georgia, they do not offer the court a specific example of any Georgia witness who is unwilling to travel to North Carolina. The third factor, therefore, weighs in favor of denying the motion.

### 4. Possible View of Premises

The fourth factor, a possible view of the premises by jurors, does not favor transfer. As noted, if a view of the place where Rhino allegedly negligently applied HFST is

- 55 -

necessary, that will take place in the Northern District of Georgia. See Speed Trac Techs., 567 F. Supp. 2d at 805 (noting that jurors do not often need to view premises, but, if they did, it would be more convenient in another forum). Still, Defendants have not suggested why a jury in a contract action would need to view the Project site. This factor does not favor transfer.

### 5. **Enforceability of a Judgment**

Factor five, enforceability of a judgment, if one is obtained, does not support transfer. "In deciding transfers between two federal districts, this factor has little relevance because a federal judgment rendered in one district is likely enforceable in another." Triad Int'l Maint. Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 671 (M.D.N.C. 2006).

### 6. **Factors Six, Seven, and Eight**

Factors six, seven, and eight do not support transfer. Factor six, the relative advantage and obstacles to a fair trial, does not support transfer; all parties would receive a fair trial in either district. Defendants have not suggested otherwise. Factor seven, any other practical problems that make a trial easy, slightly favors transfer. Plaintiff will be required to travel to another district, a factor courts consider. Speed Trac Techs., 567 F. Supp. 2d at 805. However,

- 56 -

this Georgia dispute involves a large number of Georgia actors, to include nonparties, such as GDOT personnel. The Northern District of Georgia is more convenient for them. Finally, factor eight, difficulties in court congestion, does not support transfer. Defendants have not offered any evidence of a more strained docket in this district as compared to the Northern District of Georgia. See Triad Int'l Maint., 473 F. Supp. 2d at 671 (noting evidence of differences in dockets presented by moving party).

### 7. Factors Ten and Eleven

Factor ten, appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action, slightly supports transfer. The subcontract does not contain a choice-of-law provision, per se, but it does state that, "[a]ll matters relating to the validity, performance or interpretation of this Subcontract shall be governed by the law applicable to the validity, performance or interpretation, as the case may be, of the Contract." (Subcontract (Doc. 5-1) at 12 ¶ 29.) "The Contract" is Triangle's overarching contract with the Georgia Department of Transportation. (GDOT Contract (Doc. 14-1).) The portions of that contract that were provided do not contain a choice-of-law provision. There are, of course, prodigious references to

- 57 -

Georgia statutes and regulations, but that does not answer the question. The only copy of the GDOT contract provided to the court is also not signed, nor are there any allegations about where the contract was formed. The court cannot make a determination about factor ten on the record before it, but it seems likely that Georgia law would apply.[18]

For the same reasons the court cannot accurately assess factor ten, the court also cannot assess factor eleven, the potential conflict of state laws.

### 8. Pending Suit

Finally, the court notes that some other courts have included the pendency of a related lawsuit in another district as a factor that supports transfer. Ion Beam, 156 F. Supp. 2d at 560; Chua, 1991 WL 60385, at *2. Though the Georgia lawsuit filed by the Nelsons was pending when this present action was filed in April 2019, (Compl. (Doc. 5) ¶ 36), Defendants provided no update to this court about whether that case was still pending. The Nelsons first filed their suit in November 2018, (id. ¶ 29); it is possible that matter has been resolved, and it

---

[18] The court notes that, had Defendants provided the full, executed GDOT contract, the court could have better resolved the choice-of-law issues. That analysis would have likely supported transfer since it seems likely Georgia law applies.

is Defendants' burden to show that the pendency of that action supports transfer.

### C. <u>**Transfer Analysis Summary**</u>

Defendants bear the burden of showing that the factors are "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." <u>Collins</u>, 748 F.2d at 921 (quoting <u>Gulf Oil</u>, 330 U.S. at 508). Defendants have failed to carry that burden at this stage of the proceedings. "The Court has . . . weighed the relevant factors in considering Defendant's § 1404(a) Motion to Transfer, and has undertaken an 'individualized, case by case consideration of convenience and fairness' as it relates to the facts of this case." <u>La Casa Real Estate</u>, 2010 WL 2649867, at *4. The court finds that transfer is not appropriate.

## V. <u>**CONCLUSION**</u>

For the foregoing reasons, the court finds that Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, (Doc. 8), should be denied. The court also finds that Defendants' Alternative Motion to Transfer, (Doc. 8), should be denied. The Alternative Motion will be denied without prejudice; as this case proceeds, particularly considering the relationship to Georgia, facts may be developed which alter the venue analysis herein.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss under Rule 12(b)(2) for lack of personal jurisdiction, (Doc. 8), is **DENIED WITH PREJUDICE** and that Defendants' Alternative Motion to Transfer, (Doc. 8), is **DENIED WITHOUT PREJUDICE.**

This the 30th day of April, 2020.

_William L. Osteen, Jr._
United States District Judge

- 60 -