# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TRIANGLE GRADING & PAVING, )
INC., )
        Plaintiff, )
 )
     v. )        1:19CV486
 )
RHINO SERVICES, LLC, and )
LONNIE STEVEN BLACKSTONE, )
 )
        Defendants. )

**FILED**
in the Middle District of
North Carolina

**March 29, 2023**
**5:58 pm**

Clerk, US District Court
By: _____ kg

## MEMORANDUM OPINION AND ORDER[1]

This matter is before the Court on Defendants Rhino Services, LLC ("Rhino") and its owner and manager Lonnie Steven Blackstone's ("Mr. Blackstone") (hereinafter collectively, "Defendants") motion for summary judgment. (Docket Entry 44.) Plaintiff Triangle Grading & Paving, Inc. (hereinafter "Triangle") has responded in opposition to the motion (Docket Entry 48) and Defendants have filed a reply (Docket Entry 49). This matter is now ripe for disposition. For the reasons stated herein, the undersigned will grant in part and deny in part Defendants' motion.

## I. PROCEDURAL BACKGROUND

Triangle originally filed a state action for breach of contract, enforcement of a personal guaranty given by Mr. Blackstone, and declaratory judgment. (*See* Compl., Docket Entry 5.) In May 2019, Defendants removed the action to this Court, invoking the Court's diversity

---

[1] By Order of Reference, this matter was referred to the undersigned to conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c). (Docket Entry 34.)

jurisdiction. (Docket Entry 1.) Defendants then filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or, alternatively, to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Northern District of Georgia. (Docket Entry 8.) The Court ultimately ruled that it does have personal jurisdiction over Defendants, and that Defendants have not met their burden in establishing that transfer is appropriate. (Docket Entry 24.) Thus, Defendants' motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction was denied with prejudice and their alternative motion to transfer was denied without prejudice. (*See id.* at 60.)[2]

Thereafter, Defendants filed an answer to the original Complaint and Rhino asserted counterclaims for breach of contract and attorneys' fees. (Docket Entry 25.) Triangle then filed an answer to Defendants' counterclaims. (Docket Entry 26.) Thereafter discovery commenced, Triangle filed an Amended Complaint, and Defendants answered. (Docket Entries 31, 32, 35, 36.) After the close of discovery, Defendants filed the instant motion for summary judgment. (Docket Entry 44.) Triangle thereafter filed an opposition brief (Docket Entry 48), and Defendants filed a reply (Docket Entry 49).

## II. FACTUAL BACKGROUND

This dispute arises out of a subcontract between Rhino and Triangle regarding Rhino's work on a Georgia Department of Transportation ("GDOT") construction project for Triangle (the "Subcontract"). (*See generally* Amended Complaint, Docket Entry 35; *see also*

---

[2] Unless otherwise noted, all citations in this order to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2

Subcontract, Docket Entry 5-1.[3]) Triangle was the general contractor on GDOT Project No. 0009993 (the "GDOT Project"). (Am. Compl. ¶ 8.) According to Triangle, the scope of work on the GDOT Project was to provide high friction surface treatment ("HFST"),[4] lane markings, striping, and protective barriers on designated portions of Georgia state highways. (*Id.*) On or about July 18, 2016, Rhino and Triangle entered into the Subcontract (*see id.* ¶ 9), though the scope of said agreement is in dispute. According to Triangle, "Rhino agreed to perform most of Triangle's scope of work on the [GDOT] Project" which (1) "included application of [HFST] on the [GDOT] Project and testing;" (2) included " 'perform[ing] and furnish[ing] all labor, supervision, materials, equipment, tools, transportation, storage and all other things necessary to prosecute and complete' [HFST] on the [GDOT] Project;" and (3) "included the placement of aggregate, and the placement, mixing, and heating of the epoxy." (*Id.* ¶¶ 12-13 (citations omitted).) In addition, Triangle alleges that Rhino was required to keep the work site free from waste materials and other debris by removing such debris daily, and also cleaning each area after completing its work. (*Id.* ¶ 14 (citation omitted).)

Triangle alleges that Rhino both failed to start the project on time and to complete its work on the GDOT Project. (*Id.* ¶ 16). Triangle alleges that Rhino had issues supervising its work force and maintaining its equipment. (*Id.* ¶ 17.) More specifically, Triangle alleges that the truck Rhino used for HFST application repeatedly broke down during the GDOT Project

---

[3] The Subcontract is attached to the original Complaint. It has also been submitted as part of Defendants' summary judgment material. (*See* Docket Entry 45-4.) For the sake of clarity, reference herein to the Subcontract cites to the attachment to the original Complaint (Docket Entry 5-1).

[4] According to the Amended Complaint, HFST "involves the application of aggregate to road pavement using a binding agent to restore and/or maintain pavement friction at existing or potentially high crash areas." (Am. Complaint ¶ 8 n. 1.)

3

which caused delays in Rhino's work and the entire GDOT Project. (*Id.* ¶ 18.) Triangle further asserts that Rhino performed some of its work at excess speed which resulted in Rhino's failure to install the correct amount of epoxy on certain portions of its work. (*Id.* ¶ 19.) In addition, Triangle asserts Rhino failed to clean up the GDOT Project site each day, including failing to remove aggregate buildup. (*Id.* ¶ 20.)

Next, Triangle alleges that Rhino failed to properly test the work it completed which resulted in Triangle having to re-perform those test and repair Rhino's work and/or agree to take less than full price from GDOT for the work. (*Id.* ¶ 21.) According to Triangle, Rhino's problems delayed the GDOT Project more than 74 days which resulted in GDOT assessing liquidated damages against Triangle. (*Id.* ¶¶ 22-23.) Finally, Triangle asserts that on or about September 8, 2017, Rhino walked off the GDOT Project without completing its work under the Subcontract which resulted in Triangle hiring several additional subcontractors to complete and repair Rhino's work. (*Id.* ¶¶ 24-25.) Triangle alleges that Rhino was provided with notice of its defaults but failed to cure them. (*Id.* ¶ 26.) As a result, Triangle asserts a cause of action for breach of contract against Rhino and seeks enforcement of a personal guaranty against Mr. Blackstone. (*Id.* ¶¶ 28-33, 34-39.)

Defendants filed an answer to the Amended Complaint and asserted several defenses to Triangle's claims. (*See* Docket Entry 36.) Rhino also filed counterclaims for breach of contract and attorneys' fees. (*See* Counterclaims, Docket Entry 25.)[5] In its counterclaims, Rhino alleges that it completed all of its duties, obligations and responsibilities in a satisfactory

---

[5] The counterclaims were incorporated by reference in the answer to the Amended Complaint. (*See* Docket Entry 36 at 1.)

manner under the Subcontract, which was to provide HFST services on the GDOT Project including application of the HFST, and Rhino did not breach its Subcontract with Triangle. (*Id.* ¶¶ 7-11.) Rhino alleges that it is due unpaid invoices in the amount of approximately $566,527.00, for its services relating to its work under the Subcontract performed in 2017. (*Id.* ¶¶ 13-15.) According to Rhino, it has fully performed all conditions precedent and all of its obligations under the Subcontract, Triangle has received payment from GDOT for the GDOT Project, and thus Triangle breached the Subcontract when it failed to pay Rhino all amounts due under the invoices for the work Rhino performed. (*Id.* ¶¶ 16, 19, 21.) Rhino therefore asserts its own breach of contract claim against Triangle, along with an award of attorneys' fees pursuant to the Georgia Prompt Pay Act ("GPPA"), O.C.G.A. § 13-11-8, and all other applicable laws. (*Id.* ¶¶ 17-22, 23-26.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty*

5

*Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248-49.

## IV. ANALYSIS

A. <u>Reconsideration of the Court's Prior Ruling on Defendants' Motion to Dismiss</u>

Defendants first seek reconsideration of the Court's prior ruling on Defendants' motion to dismiss for lack of personal jurisdiction. (Docket Entry 45 at 12-13.) In the April 30, 2020 Order, the Court found that Triangle had made a prima facie showing that this Court had specific jurisdiction over non-resident Defendants who "purposefully availed themselves of the protection of North Carolina's laws when they initiated an extended, collaborative relationship by virtue of a subcontract with a North Carolina corporation," and the exercise of jurisdiction otherwise comports with due process. (Docket Entry 24 at 41; *see generally id.* at 19-45.) Defendants argue that additional discovery has revealed that "Georgia is the correct forum," "Triangle's claims arise solely from its connections in Georgia on the GDOT Project,

and Rhino has not purposefully availed itself of the forum through its incidental contacts with Triangle's North Carolina Office." (*Id.* at 12-13.)

At the outset, Defendants' request is not properly before the Court as they have not filed a separate motion and support brief seeking reconsideration of the Court's prior Order. For that reason alone, it is denied. Beyond that, reconsideration of the prior Order is not warranted. Rule 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims or the rights . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). In other words, "a district court retains the power to reconsider and modify its interlocutory judgments ... at any time prior to final judgment when such is warranted." *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). "An order denying a motion to dismiss is such an interlocutory order." *Blankenship v. Fox News Network, LLC*, 510 F. Supp. 3d 356, 361 (S.D.W. Va. 2020). "Courts will reconsider an interlocutory order in the following situations: (1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." *Akeva, L.L.C. v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 566 (M.D.N.C. 2005).

Here, Defendants have not established grounds for reconsideration. Their attempt to rely on the testimony of two of Triangle's representatives (*see* Docket Entry 45 at 13 (citing Docket Entries 45-3, 45-5)) is unavailing as it does not alter the Court's previous findings that Defendants purposefully availed themselves to specific jurisdiction. (*See* Docket Entry 24 at 19-46.) The request is therefore denied.

B. Breach of Contract

Defendants contend that they are entitled to summary judgment on Triangle's breach of contract claims and Rhino's counterclaim against Triangle. (Docket Entry 45 at 14-23.) Specifically, Defendants contend that Triangle's alleged breaches stem from Rhino's failure to install one-foot-wide handwork sections of HFST and its failure to perform certain testing with a Dynamic Friction Tester ("DFT testing") that GDOT required. (*Id.* at 2, 7-11.) Defendants contend that these work obligations were outside the scope of the Subcontract, thus Triangle cannot demonstrate as a matter of law that Defendants breached the Subcontract or that Triangle is entitled to its claimed back charges. (*Id.* at 15-21.) For this same reason, Defendants contend that Triangle's attempt to enforce the personal guaranty in the Subcontract against Mr. Blackstone also fails, and Defendants are also entitled to summary judgment on its breach of contract counterclaim against Triangle as Rhino fully performed all that was required under the Subcontract and Triangle received payment from GDOT for the entire project. (*Id.* at 21-23.)

The parties do not dispute that the crossclaims for breach of contract should be analyzed under Georgia law pursuant to the Subcontract.[6] "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 502, 705 S.E.2d 305, 306 (2010) (quotations and citation omitted). A

---

[6] The Subcontract contains a provision that states it will be governed by the law governing the main contract between Triangle and GDOT ("GDOT Prime Contract"). (Subcontract ¶ 29, Docket Entry 5-1 at 12.) The GDOT Prime Contract provides that the contractual work "shall be done in accordance with the laws of the State of Georgia." (*See* GDOT Prime Contract, Docket Entry 45-1 at 13.)

breach occurs when "a contracting party repudiates or renounces liability under the contract; *fails to perform the engagement as specified in the contract*, or does some act that renders performance impossible." *Moore v. Lovein Funeral Home, Inc.*, 358 Ga. App. 10, 12, 852 S.E.2d 876, 880 (2020) (citation omitted) (emphasis added). In seeking summary judgment, Defendants argue that Triangle has failed to prove the first two elements, a breach and the resultant damages.

      i.     <u>Scope of the Subcontract.</u>

The parties' claims turn on the scope of the Subcontract, which the parties dispute. Relevant here, the Subcontract states the following:

> **Work**. Subcontractor [Rhino] shall perform and furnish all labor, supervision, services, materials, equipment, tools, transportation, storage and all other things necessary to prosecute and complete the work identified and described in Schedule A, attached hereto (the "Work"), being a portion of the work required of Contractor [Triangle] under the Contract between Owner [GDOT] and Contractor [Triangle]. The Work shall be performed by Subcontractor [Rhino] in a good and workmanlike manner strictly in accordance with the Contract Documents, consisting of the Contract and the plans, specifications (including but limited to, General, Special and Supplemental Conditions), addenda and other documents identified or attached hereto, and all subsequently and duly issued modifications thereto.
>
> …
>
> With respect to the Work, Subcontractor [Rhino] agrees to be bound to the Contractor [Triangle] by the terms and conditions of the Contract Documents and this Subcontract and hereby assumes toward Contractor [Triangle] all of the duties, obligations and responsibilities that Contractor [Triangle] has by the Contract Documents assumed toward the Owner [GDOT].

(Subcontract ¶ 1, Docket Entry 5-1 at 4 (emphasis in original.) The top of Schedule A attached to the Subcontract reads: "Furnish all labor, materials and equipment for <u>High Friction Surfaces Georgia Division 1 All Counties</u> on the project in accordance with the plans,

9

Specifications and Special Provisions." (*Id.* at 2.) Schedule A then lists, in itemized form, the quantity of the HFST (1,40090.00 square yards) at $6.97 a unit price for a total amount of $976,427.30. (*Id.*) Some of the additional listed item descriptions include: "AS PER CONTRACT PLANS & SPECIFICATIONS," "AS PER ATTACHED PROPOSAL," "CONTRACTOR TO SUPPLY ALL TRAFFIC CONTROL AND A STAGING SITE," "CONTRACTOR TO SUPPLY AGGREGATE AND EPOXY FOR SUBCONTRACTOR'S USE FOR DBI TRUCK APPLICATION," "CONTRACTOR TO DO ALL TESTING AND SUPPLY ANY TRAINING REQUIRED FOR CREWS. . . ." (*Id.*)

<u>Handwork HFST Application</u>

Defendants first argue that any obligation to perform one-foot-wide handwork sections of HFST application was outside the scope of the Subcontract and thus could not amount to a breach. (Docket Entry 45 at 16-18.) According to Defendants, the plain language of the Subcontract clearly sets forth the intent of the parties that Rhino's "work was applying HFST using the 'DBi truck application,' which was the automated application." (*Id.* at 17 (citation omitted).) Defendants further assert that there was no written change order as required by the Subcontract related to the one-foot-wide handwork HFST application. (*Id.*; *see also* Subcontract ¶ 8, Docket Entry 5-1 at 6 ("Contractor [Triangle] may from time to time, by written order ('Change Order') to Subcontractor [Rhino] make changes in the Work to the same extent and in the same manner as may be required of Contractor [Triangle] by Owner [GDOT] under the Contract Documents[.]").) Triangle argues that the Subcontract, which incorporates the GDOT Prime Contract, is unambiguous, and "it was clearly the intent of the

10

parties that Rhino would perform all of the HFST work, regardless of the means and methods, based on the fact that the total quantities listed for the HFST in the Subcontract were the exact same total quantities listed" in the GDOT Prime Contract.   (Docket Entry 48 at 9-10.) Triangle relies upon the Subcontract's statement in Schedule A, "Furnish all labor, materials and equipment for <u>High Friction Surfaces Georgia Division 1 All Counties</u> on the project in accordance with the plans, Specifications and Special Provisions" (Subcontract, Docket Entry 5-1 at 2), and the quantities listed therein for the HFST (*see id.*), which matched that of the GDOT Prime Contract (*see* GDOT Prime Contract, Docket Entry 45-1 at 6.)

Under well-settled contractual principles under Georgia law, initially "[c]onstruction of a contract . . . is a question of law for the court," *Holcim (US), Inc. v. AMDG, Inc.*, 265 Ga. App. 818, 820, 596 S.E.2d 197, 199 (2004), and involves three steps:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*CareAmerica, Inc. v. S. Care Corp.*, 229 Ga. App. 878, 880, 494 S.E.2d 720, 722 (1997) (citation omitted).   "An ambiguity is defined as duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and also signifies of doubtful or uncertain nature; wanting clearness or definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations." *Carnett's Properties, LLC v. Jowayne, LLC*, 331 Ga. App. 292, 295, 771 S.E.2d 5, 7 (2015) (quotations and citation omitted).

11

Where ambiguities are present, "the court may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent." *Greenberg Farrow Architecture, Inc. v. JMLS 1422, LLC*, 339 Ga. App. 325, 329, 791 S.E.2d 635, 639 (2016) (citation omitted); *see also Holcim (US)*, 265 Ga. App. at 820, 596 S.E.2d at 200 ("[W]here an ambiguity exists in the written terms, parol evidence may be used in ascertaining that intent."). However, "the fact that two parties disagree on a contract's meaning does not by itself render the contract ambiguous; otherwise, courts charged with presiding over a contract dispute would never be limited to the language of the agreement itself in construing it but would always be free to turn to extrinsic evidence. *Greenberg Farrow Architecture*, 339 Ga. App. at 331, 791 S.E.2d at 640. Ultimately, "[t]he cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement." *Atlanta Dev., Inc. v. Emerald Cap. Invs., LLC*, 258 Ga. App. 472, 477, 574 S.E.2d 585, 589 (2002).

Upon review of the Subcontract, the undersigned concludes that the terms of the parties' agreement are ambiguous regarding Rhino's obligations in performing the handwork HFST application. First, under the "Work" paragraph of the Subcontract, Rhino's obligations under the Subcontract are limited to the work identified and defined in Schedule A. (*See* Subcontract ¶ 1, Docket Entry 5-1 at 4.) A review of Schedule A, however, brings no clarity or definitiveness about the issue related to the handwork HFST application. Schedule A itself does not explicitly mention handwork HFST application. (*See id.* at 2.) Schedule A incorporates the GDOT Prime Contract's plans, specifications and Special provisions (*id.*), one of which defines "Continuous Section" as a "section of HFST that is placed in one continuous pass, whether by hand or with a machine." (GDOT Prime Contract, Docket Entry

45-1 at 7.) However, it further incorporates Rhino's Proposal for the work which states: "Contractor to supply aggregate and epoxy for subcontractor's use, which will be using DBi truck application." (*See* Docket Entry 46-3.) Reading these documents altogether, there terms are not clear such that the Court can look at the contract alone for its meaning on whether handwork HFST application was required. *Georgia Film Prop. Rentals, LLC v. Pennylane Funding, LLC*, No. A22A1549, 2023 WL 385163, at *3 (Ga. Ct. App. Jan. 25, 2023) (unpublished) (citation omitted) ("An ambiguity exists where the words used in the contract leave the intent of the parties in question — i.e., that intent is uncertain, unclear, or is open to various interpretations.").

As ambiguity exists in the written terms, the Court may look to extrinsic evidence to determine the intent of the parties. *Greenberg Farrow Architecture*, 339 Ga. App. at 329, 791 S.E.2d at 639; *Holcim (US)*, 265 Ga. App. at 820, 596 S.E.2d at 200. Here, such evidence clearly shows that the parties did not intend for Rhino to perform handwork HFST application as part of the Subcontract, but rather that Rhino's work would be through automated truck application. The deposition testimony of Triangle's own representative and project manager, Rick Brockman, demonstrates such. Mr. Brockman confirmed that after receiving the GDOT contract, Triangle had to find a subcontractor to perform the work and at that time, "the intent was always for [Defendants] to purchase an automated truck from DBi and do automated placement," and there was never any discussion at that time regarding hand application. (Deposition of Rick Brockman 47:2-48:7, 48:8-14, Docket Entry 45-3 at 14.) And at the time Defendants were awarded the Subcontract, the intention was that Rhino's work would be "autonomous." (Brockman Dep. 127:19-22.) Further, the price per square yards of HFST

was negotiated and agreed upon with the intent that Rhino would use an automated truck. (Brockman Dep. 49:3-8.) While Mr. Brockman explains that Rhino should have done the one-foot-wide handwork HFST application, he confirmed that Rhino never agreed to do such. (Brockman Dep. 126:10-25.)

Further, once the work began, it was Triangle that pushed back against GDOT arguing that the handwork application was outside the scope of the GDOT Prime Contract and would require an increased price. (Brockman Dep. 66:8-67:13, 76:14-24.) Triangle eventually agreed to perform the handwork, but Mr. Blackstone told Triangle that the handwork was addendum work which Rhino had never agreed to perform. (*See* Docket Entry 45-9.) All of this demonstrates that the parties did not intend for Rhino to perform one-foot-wide handwork sections of HFST application as part of the Subcontract.

Triangle attempts to rely on the rules of contract construction under Georgia law and several provisions of the Subcontract that incorporate the GDOT Prime Contract to assert that the intent of the parties at the time of executing the Subcontract was clear that Rhino agreed to perform all HFST work (*see* Docket Entry 48 at 11-12).[7] This argument, however,

---

[7] Triangle also filed a declaration on behalf of Mr. Brockman in support of Triangle's opposition brief "in which [Mr. Brockman] opines that Rhino had a contractual obligation to perform all work necessary to fully install all the HFST shown in the project plans or as directed by GDOT during the Project and that he clearly explained that fact to Mr. Blackstone." (Docket Entry 48 at 5 (citing Declaration of Rick Brockman ¶ 23, Docket Entry 46-20).) However, Mr. Brockman's declaration regarding the HFST work is inconsistent and contradicts his sworn deposition testimony that his position to GDOT was that the additional handwork sections changed the scope of the work. (*See* Brockman Dep. 76:14-24.) "It is well-settled that a plaintiff may not avoid summary judgment by submitting contradictory evidence." *Williams v. Genex Servs., LLC*, 809 F.3d 103, 110 (4th Cir. 2015); *see also Rohrbough v. Wyeth Lab'ys, Inc.*, 916 F.2d 970, 975 (4th Cir. 1990) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (quotations and citation omitted).

fails as the undersigned previously concluded that the Subcontract itself was ambiguous on the issue of handwork HFST application. Further, Triangle initially objected to performing handwork HFST application, thus Rhino and Triangle could not have intended to do such work when Triangle itself hadn't bargained for it under the GDOT Prime Contract. Ultimately, the Court concludes that the parties did not intend for Rhino to perform handwork HFST application as part of the Subcontract and therefore Defendants were not in breach of the Subcontract for failure to perform work they were not obligated to perform. *See Harris Baking Co. v. Drayprop, LLC*, No. CV411-171, 2015 WL 5786743, at *3 (S.D. Ga. Sept. 30, 2015) (unpublished) ("Given . . . the evidence in the record, the Court fails to see how Defendants could have breached the . . . agreement by failing to [carry out a duty] that they were not obligated to perform."). As there are no genuine issues of material fact on the issue of whether Rhino was to perform the one-foot-wide handwork sections of HFST application, summary judgment will be granted in Defendants' favor as to this issue.[8]

### DFT Testing & Traffic Control Duties

Defendants next dispute the scope of the Subcontract as it relates to DFT testing and traffic control. (*See* Docket Entry 45 at 18-20; Docket Entry 48 at 17-22; Docket Entry 49 at 11-12.) There is no dispute that pursuant to the Subcontract, DFT testing and traffic control responsibilities initially belonged to Triangle. (*See* Subcontract, Docket Entry 5-1 at 2.) Defendants argue that Rhino had no obligation to perform the DFT testing as there was no written modification of the Subcontract, and Rhino only helped perform testing in the summer

---

[8] For the same reason, Triangle's argument for *sua sponte* summary judgment in its favor also fails.

of 2017 as a "favor" for which it received no additional consideration. (Docket Entry 45 at 18-19; *see also* Docket Entry 45-10.) Triangle argues that after GDOT sent a letter to Triangle regarding Rhino's equipment malfunctions (Docket Entry 46-6 at 2), and Triangle thereafter sent Rhino a Notice of Cure (*id.* at 1), Rhino assumed responsibility of DFT testing and traffic control duties in exchange for the testing equipment and traffic control devices worth over $70,000 from Triangle, as well as withdrawal of Triangle's back charges for damages caused by Rhino as consideration for the subsequent contract modification. (Docket Entry 48 at 17-22.)

"Generally speaking, the terms of a written contract may be modified or changed by a subsequent parol agreement between the parties, where such agreement is founded on sufficient consideration." *Hanham v. Access Mgmt. Grp. L.P.*, 305 Ga. 414, 417, 825 S.E.2d 217, 220 (2019) (internal quotations, brackets and citation omitted). These parol agreements between parties to a contract "can be evidenced either through the parties' course of conduct, or through oral modifications." *Id.* (citations omitted). While "[c]ontractual requirements that all modifications be made in writing are valid and enforceable," *Gerdes v. Russell Rowe Commc'ns. Inc.*, 232 Ga. App. 534, 536, 502 S.E.2d 352, 354 (1998), parties can waive such requirement by their course of conduct. *Underwood v. Colony Bank*, 362 Ga. App. 548, 552, 869 S.E.2d 535, 539 (2022) ("[A] contract can be modified in this way even if the contract provides . . . that it cannot be modified except by written agreement."); *Courtland Hotel, L.L.C. v. Pew*, No. 1:07-CV-2659-LTW, 2009 WL 10697498, at *10 (N.D. Ga. Sept. 14, 2009) (unpublished) ("contractual requirements that modifications be made in writing may also be waived by the parties' course of conduct").

16

Here, the parties' dispute turns on whether the parties entered into a subsequent parol agreement to do the DFT testing and traffic control duties. Triangle asserts that Rhino agreed to take over DFT testing and traffic controls duties, pointing to a recapped conversation between Triangle Executive Vice President Jack Baily and Mr. Blackstone (Docket Entry 46-5 at 2), Mr. Blackstone's email communication to Mr. Brockman acknowledging that Rhino took over traffic control and DFT testing because Mr. Blackstone "thought it was a good idea at the time," (*see* Docket Entry 46-17), and the agreement between former Triangle representative Joseph Coleman and Mr. Blackstone that Rhino would keep the traffic control and DFT testing devices in exchange for the work (Brockman Decl. ¶ 26(c)). Triangle also points to Rhino's bill to Triangle for what Rhino identified as traffic control work. (*See* Docket Entry 45-8 at 2.) Defendants contend that Triangle's argument is based upon (1) inadmissible hearsay which is otherwise contradicted by sworn testimony; and (2) an unauthenticated email between Mr. Blackstone and Mr. Brockman. (Docket Entry 49 at 5-7.) Defendants further contend that Rhino was only assisting with DFT testing and in any event, Rhino did not retain the DFT equipment nor were there any waived back charges for additional consideration. (*Id.* at 11-12.)

Upon review, the undersigned concludes that genuine issues of material fact preclude summary judgment in Defendants' favor on the issue of DFT testing and traffic control duties. Even if the Court did not consider any inadmissible hearsay, contradictory testimony, or unauthenticated documents, *see Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."); *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.

1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."), Rhino does not dispute doing the additional work. Although Mr. Blackstone's position is that the testing was a "favor" to Triangle (Docket Entry 45-10), the record also reflects an invoice for what is identified as traffic control work. (*See* Docket Entry 45-8 at 2.) Ultimately, "when there is a question of fact with respect to whether a contract has been modified by virtue of a course of conduct, summary judgment is inappropriate." *Falcone Glob. Sols., LLC v. Maurice Ward Networks, Ltd.*, No. 1:18-CV-3379-MHC, 2020 WL 10090873, at *8 (N.D. Ga. Aug. 25, 2020) (unpublished).

Further, as to whether any subsequent agreement amongst the parties was supported by consideration, "[t]o constitute consideration, a performance or a return promise must be bargained for by the parties to a contract." O.C.G.A. § 13-3-42(a). "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Id.* § 13-3-42(b). Mr. Brockman testified that the DFT testing equipment, which was broken, was dropped off by Mr. Blackstone to be repaired. (Brockman Dep. 107:13-20.) Defendants argue that there is no dispute that Rhino did not retain the DFT testing equipment, nor were there any back charges waived. (*See* Docket Entry 49 at 12 (citing Brockman Dep. 106:16-107:23; Docket Entry 45 at 6-11).) However, this evidence raises a factual dispute as to whether any subsequent parole agreement was founded on sufficient consideration, or if instead, there was a failure to pay the consideration as promised. *See Slaick v. Arnold*, 307 Ga. App. 410, 412, 705 S.E.2d 206, 208 (2010) ("Failure to pay the consideration promised, although it constitutes a breach, does not render the conveyance invalid for lack of consideration.") (quotations and citation omitted);

18

*Keheley v. Lawrence*, 172 Ga. App. 533, 534, 323 S.E.2d 717, 718 (1984) ("[E]ven if it is shown that the recited consideration was not paid, it does not void the contract; the recital of the consideration merely gives rise to an implied promise to pay, which can be enforced by the other party.") Thus, Defendants' request for summary judgment on this issue is denied.[9]

C. <u>Rhino's Claim for Breach of Contract</u>

Rhino also seeks summary judgment on its counterclaim for breach of contract against Triangle and seeks attorneys' fees under the GPPA.[10]  (Docket Entry 45 at 22-23.)  Rhino's argument in its favor on its counterclaim is based upon its contention that Triangle's claim against Rhino for breach of contract fails as a matter of law.  (*Id.*)  As stated above, there are issues precluding summary judgment in its entirety in Defendants' favor.  Therefore, Rhino is not entitled to summary judgment in its favor on its counterclaim for breach of contract against Triangle and likewise not entitled to attorneys' fees under the GPPA at this juncture.

## V. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that the Court **GRANTS IN PART AND DENIES IN PART** Defendants Rhino Services, LLC and Lonnie Steven Blackstone's motion for summary judgment (Docket Entry 44), **GRANTING** the motion to the extent Plaintiff's claims in the Amended Complaint are based on handwork

---

[9] Because the Court concludes that summary judgment is inappropriate on the issue of DFT testing, the Court need not discuss Defendants' argument on Triangle's back charges which also relates to the testing and is also inappropriate for summary judgment.  Further, to the extent Defendants seek summary judgment on Count II of Triangle's Amended Complaint, it is also improper for the same reasons.

[10] "The [GPPA] sets forth time limits for payments to contractors and provides for interest on late payments and attorney fees to the prevailing party in an action to enforce a claim under the Act." *City of Atlanta v. Hogan Constr. Grp., LLC*, 341 Ga. App. 620, 625, 801 S.E.2d 606, 610 (2017) (citing OCGA §§ 13-11-4, 13-11-7 (a), 13-11-8).

HFST application beyond the scope of the Subcontract, but otherwise **DENYING** the motion.

Joe L. Webster
United States Magistrate Judge

March 29, 2023
Durham, North Carolina